## Staunton

MARSHALL O. TOMLIN, AN INFANT, ETC. v. SANDRA C. WORLEY, ADMINISTRATRIX, ETC.

September 10, 1965.

Record No. 6007.

Present, All the Justices.

*E. Marshall Frost* (*Caskie, Frost, Davidson & Watts*, on brief), for the plaintiff in error.

*J. Frank Shepherd*, for the defendant in error.

SNEAD, J., delivered the opinion of the court.

On September 9, 1963, Marshall O. Tomlin, an infant, instituted an action by his mother and next friend, Bertha B. Tomlin, against Sandra C. Worley, administratrix of the estate of Catherine

D. Carter. The motion for judgment alleged, among other things, that Tomlin had sustained severe personal injuries while riding as a passenger in an automobile which was owned and operated in a grossly negligent manner by the decedent, Catherine D. Carter. In her grounds of defense, the administratrix denied any act of negligence on the part of her decedent and charged that Tomlin was the driver of the vehicle. Later, the administratrix filed a counterclaim against Tomlin for his negligent operation of the car which resulted in the death of Mrs. Carter. A jury trial was had, and at the conclusion of all the evidence the court struck plaintiff's (Tomlin's) evidence as to his claim against the administratrix. The case was submitted to the jury on the counterclaim of the administratrix against Tomlin. A verdict for $20,000 was returned in favor of the administratrix, and judgment was entered thereon. We granted Tomlin a writ of error.

At times, Tomlin will be referred to as plaintiff and Sandra C. Worley, the administratrix, as defendant in accordance with the positions they occupied in the court below.

The fatal accident occurred on Sunday, August 11, 1963, at approximately 12:45 a.m., a short distance south of the Lynchburg terminus of the Carter Glass bridge on the Lynchburg expressway. The expressway is a dual highway about 52 feet wide and consists of two northbound lanes and two southbound lanes. Each of the four lanes is 10 to 12 feet wide. At the scene, the dual lanes are divided by a concrete median strip approximately 3 feet wide and 6 to 8 inches high. The strip begins about 100 feet south of the bridge. The speed limit was 45 miles an hour; the surface of the highway was dry, and the weather was clear.

The evidence discloses that defendant's decedent, Mrs. Carter, owned a 1963 Chevrolet Corvair automobile; that after midnight and a few minutes prior to the collision Mrs. Carter, age 44; her son Melvin, age 13; and plaintiff Tomlin, age 17, departed from Mrs. Carter's residence in the vehicle for a destination or purposes not shown by the record and that the car entered upon the expressway and proceeded south at an excessive rate of speed.

Ray Lyons, a friend of Tomlin who was operating an automobile in the same direction, testified that he was traveling about 60 miles an hour in the vicinity of the accident when the Corvair passed him at a speed of "at least eighty" miles an hour and "started skidding. It skidded a little to the left and aimed to go back in and swerved over to the right * * * and cut back and went up on the island in the road." He said that he continued and did not see the collision which followed.

In the meantime, Frank Horton was driving in the opposite direction in the outside northbound lane at a speed of 40 to 45 miles an hour. Horton noticed the Corvair when it was about 75 yards away "tumbling up a storm" toward him on the median strip and brought his vehicle "almost to a skidding stop." He said that the Corvair rolled over sideways three or four times and struck the front of his car while it was in the right northbound lane.

Mrs. Carter and her son, Melvin, were thrown from the Corvair onto the highway. She died before the ambulance carrying her reached the hospital. Melvin and Tomlin sustained severe injuries. The Carter vehicle was demolished, and the front of Horton's car wrecked.

In his assignments of error, plaintiff contends that the court erred in striking the evidence on his claim against the administratrix and in granting and refusing certain instructions.

Tomlin argues that the evidence was sufficient for the jury to decide that at the time of the accident Mrs. Carter was the operator of the vehicle. To sustain his position, he points out that there was no dispute that the Corvair was owned by Mrs. Carter; that there was a dent in the dashboard "about fifteen inches from the right hand side of the car" with short blonde hair in it; that his hair was blonde, and that Mrs. Carter's hair was dark brown or black. Thus, he says, the jury could infer from this evidence that Mrs. Carter was the operator of the vehicle. He also claims that the jury could have disregarded the testimony of Ray Lyons and Betty Carter Fleshman, Mrs. Carter's daughter, because at the trial of the present case they had made statements which conflicted with their prior statements.

The record conclusively shows that Tomlin was the operator of the vehicle. Raford Fleshman and his wife, Betty Fleshman (formerly Betty Carter), testified that they were at Mrs. Carter's home, which was about 2½ miles from the scene of the accident, when the car left there; that Tomlin was driving; that Mrs. Carter was seated on the right front and Melvin occupied the rear seat. Ray Lyons stated that as he passed the Carter house on his way to the expressway he observed the Carter vehicle coming out of the driveway. He said that Tomlin was driving; that Mrs. Carter was riding on the right front seat; that Melvin was on the rear seat; and that just before the accident Tomlin was driving and passed him at a speed of "at least eighty" miles an hour. He was asked on re-direct examination:

"Q. What we want to know, Ray, is when that car went up on that median strip who was the driver?

"A. Marshall Tomlin.

"Q. Any doubt in your mind about it?

"A. Not a bit."

Frank Horton, the driver of the car which was struck, said that he found Tomlin sitting in the driver's seat with both hands on the wheel. James Grishaw, who lived nearby, heard the crash and rushed to the scene. He stated that he did not know any of the people involved in the accident; that he was the first person to arrive; and that he rendered first aid to Tomlin who was in the driver's seat. His testimony was corroborated by other witnesses who arrived at the scene shortly after the collision occurred.

Tomlin testified that he had no recollection of what happened and did not know who was driving at the time of the collision. Melvin Carter was not called as a witness.

The fact that Mrs. Carter was the owner of the car and that hair resembling Tomlin's was found in the dent on the dashboard "about fifteen inches from the right hand side of the car" was not sufficient to present a jury question as to whether Mrs. Carter was operating the vehicle at the time of the collision in face of the overwhelming evidence that she was not driving. The record shows that seat belts were not used by any of the occupants of the car, and it is manifest that at any moment between the time the car began "tumbling up a storm" and the time it came to rest just off the highway Tomlin's head could easily have been thrown against the dashboard whether he was in the driver's seat or on the right front seat. Even though the testimony of Lyons and Betty Fleshman be disregarded, as Tomlin says the jury could have done, it was clearly shown by other evidence that Tomlin was the driver.

We hold that the evidence was not sufficient to make it a jury question whether Mrs. Carter was the operator of the vehicle when the collision occurred and that the trial court did not err in striking plaintiff's evidence on his claim against the administratrix.

■ We turn now to a consideration of the instructions in question. Plaintiff's chief contention is that the court erred in refusing to instruct the jury as to contributory negligence or assumption of risk on the part of defendant's decedent, Mrs. Carter.

On Saturday evening, August 10, sometime after 9 p.m. when Mrs. Carter left her place of employment she, together with her daughter Betty Carter Fleshman (then unmarried), Raford Fleshman and the plaintiff, Marshall O. Tomlin, went to the "Barn"[1], a restaurant just

---

[1] Counsel for defendant stated in his brief that Melvin Carter, Peggy Carter and her escort were also present at the supper party at the "Barn". However, the record is silent with regard to their presence.

outside of Lynchburg in Amherst county, for supper. Fleshman and Tomlin left the premises and returned with a quantity of beer. On cross-examination Betty Fleshman testified that she thought Raford consumed "two or three" beers; that "about sixteen or seventeen beers apiece" were consumed; and that Marshall had "a few more" than Mrs. Carter did. However, she immediately qualified this testimony and said that all of the persons who were drinking consumed a total of sixteen cans of beer.

Fleshman testified that he did not drink any beer with Mrs. Carter, but that he drank one beer at the "Barn." All of the evidence adduced at the trial pertaining to the trip to and from the restaurant, the events that transpired at the restaurant, and the drinking of beer was presented by Raford and Betty Fleshman. Their complete testimony with regard to this entire episode is printed in the margin.[2]

[2] RAFORD FLESHMAN—Cross-examination
By Mr. Rosenberger:
"Q. Were you drinking beer that night?
"A. No, sir.
"Q. You didn't have a thing to drink that night?
"A. Oh, yes, I drank a couple of beers earlier that evening but not that night.
"Q. How do you make a distinction between evening and night? After supper did you have anything to drink?
"A. No, sir.
"Q. You didn't. You were with Betty that night?
"A. Yes, sir.
"Q. Betty and you and Marshall and her mother were together?
"A. Yes, sir.
"Q. Did Mrs. Carter drink any beer with you?
"A. No, not with me she didn't.
"Q. Wern't (sic) you with them all the time until they came up to the Carter house about quarter after 12:00?
"A. Well, we went to the Barn that evening to eat supper we ordered and Marshall and I went in and got some beer. I drank some beer while we were at the Barn, drank one.
"Q. Just this one order of beer was all they had?
"A. All who had?
"Q. You and Marshall and Mrs. Carter.
"A. I didn't drink anything with Mrs. Carter. I drank one coming from where we bought the beer going to the Barn.
"Q. What time was that?
"A. I would say it was around 6:30 or 7:00."
BETTY CARTER FLESHMAN—Cross-examination
By Mr. Rosenberger:
"Q. Do you remember testifying in the Corporation Court in December of '63 just a month and a half ago?
"A. I know we were there but I don't know the questions that were asked.
"Q. At that time didn't you tell about the beer that your mother and Raford Fleshman and Marshall drank?
"A. They drank some, I know that.
"Q. Didn't you say that every time your mother drank a beer Marshall drank a beer?

It is true that contributory negligence is usually a question for the jury. *Greyhound Lines* v. *Brown*, 203 Va. 950, 952, 953, 128 S.E. 2d 267. It is likewise true that the burden of proving contributory negligence is upon the defendant. (Tomlin was defendant on the counterclaim.) *Unger* v. *Rackley*, 205 Va. 520, 138 S.E. 2d 1; *Minter* v. *Clements*, 206 Va. 403, 143 S.E. 2d 847, this day decided. It is also well settled that an instruction should not be given when there is no evidence tending to prove the facts upon which the instruction is grounded. More than a scintilla of evidence is required. *Parker* v. *Leavitt, Adm'r*, 201 Va. 919, 926, 927, 114 S.E. 2d 732; *Wagner* v. *Fiery, T/A, etc.*, 206 Va. 370, 143 S.E.2d 876, this day decided.

In *Arrington, Adm'r* v. *Graham, Adm'r*, 203 Va. 310, 314, 124 S.E. 2d 199, Mr. Justice Spratley, speaking for the court, distinguished the doctrines of contributory negligence and assumption of risk. There it is stated:

"The doctrines of assumption of risk and contributory negligence are not identical. They are closely associated, but there is a distinction between them which has not always been observed in the decisions.

" 'The essence of contributory negligence is carelessness; of assumption of risk, venturousness. Thus an injured person may not have acted carelessly; in fact, may have exercised the utmost care, yet may have assumed, voluntarily, a known hazard. If so, he must accept the consequence.' *Hunn* v. *Windsor Hotel Company*, 119 W. Va. 215, 193 S.E. 57, 58; *Tiller* v. *N. & W. Ry. Co.*, 190 Va. 605, 612, 58 S.E. 2d 45.

---

"A. Yes, sir.

"Q. And didn't you say Raford, Your husband, was drinking a beer?

"A. I think he had two or three.

"Q. Where were your mother and Melvin and Marshall going when they left you girls at home at 12:30 at night and went off?

"A. I don't know.

"Q. You went into the number of six-packs they bought and consumed that night, didn't you?

"A. Yes, sir.

"Q. How many were there?

"A. I think there were about sixteen or seventeen beers apiece.

"Q. About sixteen beers apiece. Your mother had about sixteen and Marshall had about sixteen.

"A. Marshall had a few more than she did.

By Mr. Shepherd:

"Q. You mean sixteen each or sixteen altogether?

"A. No, sir, I mean altogether.

"Q. You mean all the people that were drinking beer drank about sixteen cans of beer?

"A. Yes, sir."

"It is now fairly well settled that where one voluntarily assumes the risk of injury from a known danger, he is debarred from a recovery in negligence cases. *Weston* v. *Hospital of St. Vincent of Paul*, 131 Va. 587, 593, 107 S.E. 785, 23 A.L.R. 907; 38 Am. Jur., Negligence, § 171, pages 845 and 846.

"Various statements of the distinction between the doctrines of assumed risk and contributory negligence are found in the cases. Among them are the following: '(A)ssumed risk implies intentional exposure to a known danger, which may or may not be true of contributory negligence; and that assumption of risk embraces a mental state of willingness, while contributory negligence is a matter of conduct.' 65 C.J.S., Negligence, § 117, page 711; 38 Am. Jur., Negligence, § 172, page 847."

In the case at bar, there was no showing of the hour the parties arrived at and departed from the restaurant, the length of time in which the beer was consumed, or whether the drinking occurred before, during, or after supper. Any of these factors would have a bearing on the effect the beer had upon Tomlin and Mrs. Carter. All we know is that sometime between shortly after 9 p.m. and about 12:15 a.m. the beer was consumed. Moreover, the evidence does not clearly show the actual number of cans of beer consumed by either Tomlin or Mrs. Carter, or whether Fleshman, Tomlin and Mrs. Carter were the only persons in the party who drank the beer. No witness testified that they were the only persons who participated in the drinking. The record is silent as to whether Betty Fleshman or anyone else drank any of it.

A fair interpretation of Betty Fleshman's testimony reveals that about sixteen cans of beer were drunk altogether. The record shows that at the conclusion of her testimony on direct examination she became emotionally upset and a recess was had in order that she might compose herself. Her testimony relating to the consumption of beer was given soon after she resumed the witness stand for cross-examination. She testified:

By Mr. Rosenberger:

"Q. How many were there?

"A. I think there were about sixteen or seventeen beers apiece.

"Q. About sixteen beers apiece. Your mother had about sixteen and Marshall had about sixteen.

"A. Marshall had a few more than she did.

By Mr. Shepherd:

"Q. You mean sixteen each or sixteen altogether?

"A. No, sir I mean altogether.

"Q. You mean all the people that were drinking beer drank about sixteen cans of beer?

"A. Yes, sir."

Furthermore, not a single witness testified that he smelled the odor of alcohol on the breath of either Tomlin or Mrs. Carter, or that Tomlin's speech, muscular movement, appearance, disposition, manner or behavior was in any degree affected by his drinking so as to put Mrs. Carter on reasonable notice that his ability to drive had been impaired. See *Basham* v. *Terry, Administratrix,* 199 Va. 817, 102 S.E. 2d 285.

The record is devoid of any evidence tending to show that Tomlin drove Mrs. Carter's vehicle at an excessive rate of speed or in a reckless manner from the time he drove from her home until sometime after he had entered upon the expressway, a distance of more than a mile. While it is unquestionably true that drinking often results in excessive speed and causes accidents such as here involved, it is common knowledge that accidents of this type frequently occur where drivers have not partaken of intoxicating beverages.

If the court had instructed the jury on the doctrine of contributory negligence or assumption of risk under the facts and circumstances of this case, it would have permitted the jury to delve into the prohibited area of speculation and conjecture.

Instruction A, which was granted over plaintiff's objection, defined the duties of Tomlin in the operation of his vehicle and told the jury that if they found that he failed to perform any one or more of them and that such failure, if any, was a proximate cause of the accident, then they "shall" find for defendant, Sandra C. Worley, administratrix. Tomlin contends that the instruction is erroneous because it failed to include a provision relating to the contributory negligence of Mrs. Carter. Refused instructions Nos. 7, 8 and 9 contained the principles of contributory negligence, comparative negligence, and assumption of risk, respectively. Since we hold that the evidence was insufficient to instruct the jury on contributory negligence and assumption of risk, we conclude that there was no reversible error in the trial court's rulings on the instructions complained of.

Accordingly, the judgment appealed from is

*Affirmed.*